THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| **RICHITA MARIE HACKFORD,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:23-cv-00618-JCB<br><br>Magistrate Judge Jared C. Bennett |

Under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, pro se Plaintiff Richita Marie Hackford ("Ms. Hackford") has consented to Judge Jared C. Bennett conducting all proceedings in this case, including entry of final judgment.[1] Before the court is Ms. Hackford's complaint.[2] Ms. Hackford has been permitted to proceed in forma pauperis under 28 U.S.C. § 1915 ("IFP Statute").[3] Accordingly, the court reviews the sufficiency of Ms. Hackford's complaint under the authority of the IFP Statute. Based upon the analysis set forth below, the court dismisses Ms. Hackford's complaint without prejudice.

## BACKGROUND

The following background is based on the court's liberal reading of Ms. Hackford's 39-page complaint, which is principally a historical summary of federal government action related to the Shoshone Snake bands of the Shoshone Uinta River Valley Reservation. Ms.

---

[1] ECF No. 6.

[2] ECF No. 5.

[3] ECF No. 4.

Hackford alleges that she is an enrolled member of the Shoshone Snake band Indians of Utah Territory, Shoshone Uinta(h) River Valley Reservation ("Shoshone Snake bands").[4] Ms. Hackford brings this action against Defendant United States of America ("United States") for "breaches and violations" of the following: "the 1848 Treaty of Guadalupe Hidalgo, Article XI, the Presidential Executive Order October 3, 1861 President Abraham Lincoln, the United States Senate Act May 5, 1864 (13 Stat. 63), the January 25, 1865 Public Notice Issued from Camp Douglas, Utah Territory, and the June 8, 1865 Unratified Spanish Fork Treaty."[5] Ms. Hackford's claims are difficult to decipher due to their enmeshment with Ms. Hackford's account of the historical record of the treaties, executive order, congressional act, and notice she alleges have been violated. However, in short, Ms. Hackford appears to allege that the United States has been "grossly negligent and derelict"[6] by failing to enforce the Treaty of Guadalupe Hildago and that the United States's negligence has resulted in "unlawful encroachment and infringements" of the Shoshone Snake bands' territory.[7]

The court quotes what appear to be Ms. Hackford's primary grievances against the United States. Ms. Hackford alleges that:

> The United States has violated [its] solemn obligation to restrain from placing it[]s Indian occupants, the [Shoshone Snake bands,] under the necessity of seeking new homes, by allowing the invasions and unlawful encroachment and infringements by the State of Utah's Mormons . . . to unlawfully 'squat' within the [Shoshone Snake bands'] Shoshone Uinta River Valley Reservation.

---

[4] ECF No. 5 at 1.

[5] *Id.*

[6] *Id.* at 10.

[7] *Id.*

> . . . .
>
> The United States has violated the [Shoshone Snake bands'] "Sovereignty" by having not enforced the 1865 Order issued from Camp Douglas to secure and [e]nsure the protection of the Uinta(h) River Valley Reservation lands, including its [Shoshone Snake bands'] peace and safety . . . . [Ms. Hackford] is seeking relief" from said Utah Mormons['] invasions by the [United States] in 'breach and violation' of the 1848 Treaty of Guadalupe Hidalgo, Article XI.
>
> . . . .
>
> There is absolutely no congressional or federal record that supports that Utah's United States Department of Justice, United States Attorney's office, as legal representatives of the government of the [United States] . . . actually ever took any affirmative action or measures towards the fulfillment of the government's own "direct order to remove all white settlers primarily Utah's Mormons" from the [Shoshone Snake bands'] Uinta(h) River Valley Reservation as per said order issued on January 25, 1865.[8]

Additionally, Ms. Hackford claims:

> [T]he unlawful actions of H.M. Tidwell, Superintendent, of the federal Uinta(h) Agency based upon the United States Senate, Subcommittee of the Committee on Indian Affairs Report in its entirety leaving the entire report open for further legal scrutiny and congressional investigation into Superintendent Tidwell's unauthorized and illegal actions and the <u>United States as overseer and the State of Utah venerable and liable for falsely making it appear to be a State Ute Reservation</u>, thus, murdering the 'truth' of the ownership of the Shoshone Snake bands Indians of Utah territory, Uinta River Valley Reservation.
>
> . . . .
>
> [T]he lumping together and combining of the Shoshone Snake, <u>seven</u> bands Indians of Utah Territory, Uinta agency, as the alleged Uinta band of the Shoshone Uinta(h) River Valley Reservation within the Uinta Yampah State Ute citizens under the fraudulently alleged IRA – Ute Indian Tribe, did not make [Ms. Hackford] then

---

[8] *Id.* at 3, 5-6, 9.

> or now, a state Uintah Yampah Ute Citizen, and is a federal criminal act of fraud lodged against the Shoshone Snake *seven* bands Indians of Utah Territory, Shoshone Uinta River Valley Reservation.
>
> . . . ..
>
> [Ms. Hackford's] property at 820 East 300 North in Roosevelt [is] fraudulently alleged by the USDA – Utah's Mormon 'federal agency' located in downtown Salt Lake City, Utah as being []no longer within the boundaries of the Shoshone Snake *seven* bands Indians of Utah Territory, Shoshone Uinta River Valley Reservation is just, simply put, not 'true' criminal acts of fraud didn't and couldn't eliminate the October 3, 1861 Executive Order Shoshone Uinta River Valley Reservation or the U.S. Senate May 5, 1864 (13 Stat. 63) confirmation for the Shoshone Snake *seven* bands Indians of Utah Territory, or the January 25, 1865 Notice issued from Camp Douglas, Utah Territory or the unratified Spanish Fork Treaty Lands, or the lands designated as Utah Territory, but what it did do and continues to do is 'breach and violate' the 1848 Treaty of Guadalupe Hidalgo, Article XI.[9]

Based on these allegations, Ms. Hackford seeks the return of three homes from which she was evicted,[10] "damages from losses from stolen 'assets' under acts of fraud,"[11] an accounting of "tithing" and "income" that both the "Mormons Corporate Headquarters" and the State of Utah have "fraudulently derived" from the Shoshone Snake bands,[12] and, finally, that the United States "honor" and "uphold" the laws outlined in Ms. Hackford's complaint.[13]

---

[9] *Id.* at 23-24, 29-30.

[10] *Id.*

[11] *Id.* at 33.

[12] *Id.* at 36.

[13] *Id.* at 37.

**LEGAL STANDARDS**

To review Ms. Hackford's complaint, this court must consider two legal standards. First, the court considers the legal standards relating to federal subject-matter jurisdiction and dismissal under Fed. R. Civ. P. 12(b)(1). Second, the court considers the law pertaining to failure to state a claim on which relief can be granted under Fed. R. Civ. P. 12(b)(6). Each legal standard is set forth below.

### I.  Federal Jurisdiction

Federal courts are courts of limited subject-matter jurisdiction.[14] Fed. R. Civ. P. 12(b)(1) allows a court to dismiss a complaint for "lack of jurisdiction over the subject matter." The party invoking federal jurisdiction bears the burden of establishing such jurisdiction.[15] To do so, the plaintiff "must allege in [her] pleading the facts essential to show jurisdiction and must support [those facts] by competent proof."[16] When it appears that a federal court lacks jurisdiction of the subject matter, the court must dismiss the action.[17]

### II.  Failure to State a Claim

Whenever the court authorizes a party to proceed without payment of fees under the IFP Statute, the court is required to "dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted."[18] In determining whether a

---

[14] *Gad v. Kansas State Univ.*, 787 F.3d 1032, 1035 (2015).

[15] *Radil v. Sanborn Western Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. 2004) (quotations and citations omitted).

[16] *U. S. ex rel. Precision Co. v. Koch Indus.*, 971 F. 2d 548, 551 (10th Cir. 1992) (second alteration in original) (quotations and citations omitted).

[17] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

[18] 28 U.S.C. § 1915(e)(2)(B)(ii).

complaint fails to state a claim for relief under the IFP Statute, the court employs the same standard used for analyzing motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[19] Under that standard, the court "accept[s] as true the well pleaded factual allegations [in the complaint] and then determine[s] if the plaintiff has provided 'enough facts to state a claim to relief that is plausible on its face.'"[20] "Rather than adjudging whether a claim is 'improbable,' '[f]actual allegations [in a complaint] must be enough to raise a right to relief above the speculative level.'"[21]

Additionally, Fed. R. Civ. P. 8 is incorporated into the court's Rule 12(b)(6) analysis.[22] Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[23] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[24] Rule 8 requires, at least, that the allegations of a complaint put the defendant fairly on notice of the basis for the claims against it.[25] Indeed, the twin purposes of a complaint are to give

---

[19] *Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007).

[20] *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[21] *Kay*, 500 F.3d at 1218 (quoting *Twombly*, 550 U.S. at 555-56) (alterations in original).

[22] *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010).

[23] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557) (alteration in original).

[24] *Id*.

[25] *Twombly*, 550 U.S. at 555.

the opposing party that notice so that it may respond and to allow the court to conclude that the allegations, if proven, show that the plaintiff is entitled to relief.[26]

In analyzing Ms. Hackford's complaint, the court is mindful that she is proceeding pro se and that "[a] pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers."[27] However, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant."[28] Consequently, the court "will not supply additional facts, nor will [it] construct a legal theory for [a pro se] plaintiff that assumes facts that have not been pleaded."[29] Indeed, as the United States Court of Appeals for the Tenth Circuit stated:

> The broad reading of [a pro se] plaintiff's complaint does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based. . . . [C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based. This is so because a pro se plaintiff requires no special legal training to recount the facts surrounding [her] alleged injury, and [she] must provide such facts if the court is to determine whether [she] makes out a claim on which relief can be granted. Moreover, in analyzing the sufficiency of the plaintiff's complaint, the court need accept as true only the plaintiff's well-pleaded factual contentions, not [her] conclusory allegations.[30]

---

[26] *Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n of Kan.*, 891 F.2d 1473, 1480 (10th Cir. 1989).

[27] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see also Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1187 (10th Cir. 2003).

[28] *Bellmon*, 935 F.2d at 1110.

[29] *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989) (per curiam).

[30] *Bellmon*, 935 F.2d at 1110 (citations omitted).

After reviewing a pro se plaintiff's complaint under the IFP Statute, the court may dismiss the complaint for failure to state a claim "only where it is obvious that the plaintiff cannot prevail on the facts [she] has alleged and it would be futile to give [her] an opportunity to amend."[31]

## ANALYSIS

The court dismisses Ms. Hackford's complaint for two reasons: (I) the court lacks jurisdiction over Ms. Hackford's claims because she fails to establish a waiver of the United States' sovereign immunity; and (II) Ms. Hackford fails to state claims upon which relief can be granted. Because these deficiencies would not be curable by amendment, (III) allowing Ms. Hackford an opportunity to amend her complaint would be futile. Therefore, the court dismisses this action without prejudice.

I. **The Court Lacks Jurisdiction Over Ms. Hackford's Claims Because She Fails to Establish a Waiver of the United States' Sovereign Immunity.**

The court lacks subject-matter jurisdiction over this action because Ms. Hackford has failed to establish a waiver of the United States' sovereign immunity. "The United States, as sovereign, is immune from suit save as it consents to be sued."[32] The United States' consent to be sued is a "prerequisite for jurisdiction."[33] When the United States has not waived its sovereign immunity, a lawsuit must be dismissed for want of subject-matter jurisdiction.[34] "A waiver of

---

[31] *Kay*, 500 F.3d at 1217 (quotations and citation omitted).

[32] *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quotations and citation omitted).

[33] *United States v. Mitchell*, 463 U.S. 206, 212 (1983).

[34] *Flute v. United States*, 808 F.3d 1234, 1239 (10th Cir. 2015).

sovereign immunity cannot be implied."[35] "The government consents to be sued only when Congress unequivocally expresses its intention to waive the government's sovereign immunity in the statutory text."[36]

As the plaintiff in this action, Ms. Hackford bears the burden of establishing federal jurisdiction.[37] To do so, she "must allege in [her] pleading the facts essential to show jurisdiction, and must support [those facts] by competent proof."[38] In this case, the court lacks subject-matter jurisdiction over Ms. Hackford's claims because she has not established compliance with any waiver of sovereign immunity allowing her to sue the United States. Specifically, Ms. Hackford has failed to identify any statutory language or other express provision that unequivocally waives sovereign immunity for her claims against the United States. Accordingly, the court lacks subject-matter jurisdiction over Ms. Hackford's claims.

II. **Ms. Hackford Fails to State Claims Upon Which Relief Can Be Granted.**

Even if the court could exercise jurisdiction over Ms. Hackford's claims, she fails to state actionable claims for relief for the following reasons: (A) Ms. Hackford fails to state a claim under the Treaty of Guadalupe Hidalgo because this treaty does not create a private right of action; and (B) the remaining executive order, statute, notice, and treaty Ms. Hackford alleges the United States has violated also do not create a private right of action or allow for judicial review, and, therefore, any claim Ms. Hackford makes under them also fails.

---

[35] *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 95 (1990).

[36] *U.S. v. Murdock Mach. and Eng'g Co. of Utah*, 81 F.3d 922, 930 (10th Cir. 1996).

[37] *Penteco Corp. Ltd. P'ship --- 1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991).

[38] *Koch Indus.*, 971 F. 2d at 551 (second alteration in original) (quotations and citations omitted).

A. <u>Ms. Hackford Fails to State a Claim Under the Treaty of Guadalupe Hidalgo</u>.

Ms. Hackford appears to claim certain protections provided by Article XI of the Treaty of Guadalupe Hidalgo, which formally ended the war between the United States and Mexico in 1848.[39] Article XI of the Treaty states, in relevant part,

> Considering that a great part of the territories, which, by the present treaty, are to be comprehended for the future within the limits of the United States, is now occupied by savage tribes, who will hereafter be under the exclusive control of the Government of the United States, and whose incursions within the territory of Mexico would be prejudicial in the extreme, it is solemnly agreed that all such incursions shall be forcibly restrained by the Government of the United States whensoever this may be necessary . . . the sacredness of this obligation shall never be lost sight of by the said Government, when providing for the removal of the Indians from any portion of the said territories, or for its being settled by citizens of the United States; but on the contrary, special care shall then be taken not to place its Indian occupants under the necessity of seeking new homes, by committing those invasions which the United States have solemnly obligated themselves to restrain.[40]

However, this Treaty does not create privately enforceable rights.[41] "As a general rule, treaties do not create privately enforceable rights in federal courts [and] [the Treaty of Guadalupe Hidalgo] is no exception."[42] In the absence of a private right of action, Ms. Hackford cannot state an actionable claim for relief under the Treaty of Guadalupe Hidalgo.

---

[39] *See, e.g.*, *Martinez v. Gonzales*, Civ. 13cv922 RHS/WPL, 2014 WL 12650983, at *2 (D.N.M. June 30, 2014).

[40] David H. Miller, TREATIES AND OTHER INTERNATIONAL ACTS OF THE UNITED STATES VOL. 3, 298-301 (United States Government Printing Office, 1931-1938).

[41] *N. New Mexicans Protecting Land, Water and Rights v. United States*, 704 F. App'x 723, 727 (10th Cir. 2017) (citing *O'Donnell v. United States*, 91 F.2d 14, 39 (9th Cir. 1936) ("All the authorities are agreed that the provisions of the Treaty of Guadalupe Hidalgo . . . are not self-executing.")).

[42] *Id*.

B. <u>Ms. Hackford Fails to State Any Other Actionable Claim</u>.

Ms. Hackford fails to state any other actionable claim because the remaining executive order, statute, notice, and treaty she cites also do not create a private right of action or allow for judicial review. Therefore, any claim Ms. Hackford makes under these also fails. In addition to the Treaty of Guadalupe Hidalgo, Ms. Hackford repeatedly cites to "the Presidential Executive Order October 3, 1861 President Abraham Lincoln, the United States Senate Act May 5, 1864 (13 Stat. 63), the January 25, 1865 Public Notice Issued from Camp Douglas, Utah Territory, and the June 8, 1865 Unratified Spanish Fork Treaty."[43]

To illuminate the historical record of the government action Ms. Hackford discusses in her complaint, the court relies heavily on the background recounted by this court in *United States v. Uintah Valley Shoshone Tribe*:[44]

> The [Uintah Valley Shoshone Tribe] is not a tribe currently recognized by the United States. It is currently an organization composed of "Mixed-Bloods" (and their descendants) who were formerly members of the Ute Tribe, but whose membership therein and relationship to the federal government was terminated under the Ute Partition and Termination Act of 1954 ("UPTA").
>
> . . . .
>
> The original Uintah Valley Reservation was created in 1861 by President Abraham Lincoln. Through this Executive Order, President Lincoln approved a recommendation of the Secretary of the Interior that "the Uintah Valley, in the Territory of Utah, be set apart and reserved for the use and occupancy of Indian Tribes."
>
> A few years after Lincoln issued the Executive Order of 1861, the Act of May 5, 1864, 13 Stat. 63, "authorized and required the Superintendent of Indian Affairs to bring together and settle in the

---

[43] *See, e.g.*, ECF No. 5 at 1, 6, 22, 27, 28.

[44] No. 2:17-cv-1140-BSJ, 2018 WL 4222398 (D. Utah Sep. 5, 2018).

> Uintah Valley as many of the Indians of Utah Territory as might be found practicable. It said that the Uintah Valley 'is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same.'"
>
> In 1865 a document known as the "Spanish Fork Treaty" was negotiated with numerous Indian groups in Utah providing for their surrender of all their rights in land in that territory which was suitable for agricultural and mineral purposes, but reserving to the Indians for their exclusive use and occupation the entire valley of the Uintah River within Utah Territory. Although the "Spanish Fork Treaty" was never ratified by the United States Senate, "various individual Indians and groups of Utah Indians, from time to time after 1865, moved into the Uintah Valley . . . [T]he Indians so migrating into the reservation, as well as those already there before the reservation was established, and their descendants, became and have since been known as the Uintah Indians or Uintah Ute Indians . . . and became grantees" under the 1864 Act.[45]

Considering this, Ms. Hackford cannot state a plausible claim for relief under President Lincoln's 1861 Executive Order, The Act of May 5, 1864, 13 Stat. 63—which confirmed the President's action and created the Uintah Valley Reservation—or the 1865 Public Notice Issued from Camp Douglas—which provided notice of the Executive Order and Act of Congress and directed that "'all white settlers must forthwith remove from the Uintah Reservation'"[46]— because none of these created a cause of action or mentioned judicial review. Additionally, Ms. Hackford cannot state a plausible claim under the Spanish Fork Treaty because it "was never ratified" and thus has "no legal effect."[47] Therefore, Ms. Hackford fails to state claims upon which relief can be granted.

---

[45] *Id.* at *1-2 (footnote and citations omitted) (third, fourth, and fifth alterations in original).

[46] ECF No. 5 at 7.

[47] *Uintah Valley Shoshone Tribe*, 2018 WL 4222398, at *3; *see also Timpanogos Tribe v. Conway*, No. 2:00-CV-734 TC, 2005 WL 8176199, at *8 (D. Utah Jan. 24, 2005).

### III. Granting Ms. Hackford an Opportunity to Amend Her Complaint Would be Futile.

As stated above, after reviewing a pro se plaintiff's complaint under the IFP Statute, the court may dismiss the complaint for failure to state a claim "only where it is obvious that the plaintiff cannot prevail on the facts [she] has alleged, and it would be futile to give [her] an opportunity to amend."[48] Based upon the foregoing analysis, this court lacks jurisdiction over this action and Ms. Hackford has failed to state a plausible claim for relief. An amended complaint cannot cure these deficiencies because there is no set of facts that Ms. Hackford could allege under the cited executive order, statute, notice, and treaties that would grant the court jurisdiction or create a private cause of action. Under these circumstances, allowing Ms. Hackford an opportunity to amend her complaint would be futile. Therefore, this action is dismissed without prejudice.

IT IS SO ORDERED.

DATED this 28th day of June 2024.

BY THE COURT:

_____
JARED C. BENNETT
United States Magistrate Judge

---

[48] *Kay,* 500 F.3d at 1217 (quotations and citation omitted).